UNITED STATES OF AMERICA

IN THE DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

MILTON ABRAHAM AGAY
& MICHELLE AGAY

         Plaintiffs,

                                Case No. 14-

-v-

                                Hon.

                                Mag.

MICHAEL HILDEBRAND in his individual capacity and
his official capacity Township Supervisor of Oronoko Charter Township,
a Michigan municipal corporation & the Oronoko Charter Township,
Peter Letzmann, individually, and d/b/a as Letzmann Associates
         Defendants.
_____/

Eugenie B. Eardley (P48615)
Nicholas F.X. Gumina (P74203)
EARDLEY LAW OFFICES, P.C.
Attorneys for Plaintiffs
P.O. Box 830
Cannonsburg, MI 49317-0830
(616) 874-2647
genieb@eardleylaw.com

## Complaint and Demand for Jury Trial

        NOW COMES the Plaintiffs, Milton & Michelle Agay by and through their attorneys,

Eardley Law Offices, P.C., and in support of their complaint against the defendants, hereby state as

follows:

### A.   Statement of Jurisdiction

1.       The Plaintiff Milton A. Agay (hereinafter Plaintiff) is and was a resident of the County of

Berrien, State of Michigan at all times outlined in the Complaint.

2.      Plaintiff, Michelle E. Agay, (hereinafter Plaintiff's spouse) is and was a resident of County of Berrien, State of Michigan at all times outlined in the Complaint, and lawfully married to Plaintiff Milton A. Agay.

3.      The individual Defendant, Michael Hildebrand, is and was acting as Supervisor of the Oronoko Township at all times outlined in this Complaint.

4.      Defendant Oronoko Charter Township (Hereinafter Defendant Township) is a Michigan municipal corporation, located in Berrien County, Michigan.

5.      Peter Letzmann is a licensed attorney, and was hired by the Township sometime in February 2014, allegedly in order to do an "assessment" of the Berrien Springs/Oronoko Township Police Department.

6.      Letzmann & Associates is a d/b/a of Letzmann, offering mediation and consulting services to municipalities, of which Peter Letzmann is its principal and owner.

7.      Plaintiff alleges violations of various federal statutes including 42 USCA Sec. 1983, USCA, Amendment 1, as well as the Due Process Clause of the Fourteenth Amendment, therefore, this Honorable Court possesses subject matter jurisdiction.

8.      Venue is proper in the United States District Court for the Western District of Michigan, Southern Division pursuant to 28 USC Sec. 1391.

## B.   Factual Allegations

Plaintiff incorporates all prior averments, as if fully set forth herein.

9.      The Plaintiff, a male, born in 1963, began his employment as part-time police officer with Oronoko Township, also known as (Berrien Springs/Oronoko Township) in April 2000.

10.     Plaintiff became a fulltime police officer for the Township on May 12, 2000.

11.     Plaintiff was hired as interim Police Chief of the Township in May 2007, pending search for a new Police Chief upon the departure of former Police Chief James

Kesterke.

12. An employment contract was signed by Plaintiff and the Township, on December 20, 2007 installing Plaintiff as Chief of Police.

13. Various amendments to the employment contract were adopted over the succeeding years, and approved by the Township Board.

14. Plaintiff has been continuously employed from December 20, 2007, as Police Chief of Defendant Oronoko Township through to the present.

15. Defendant Township has an authorized strength of 9 full time officers, including Plaintiff.

16. Plaintiff had overall favorable written job evaluations and no discipline from the time of the signing of December 20, 2007 contract through to February 2014.

17. In November 2012, the son of the prior Township Supervisor, Ernest Hildebrand, Defendant Michael Hildebrand was elected to the position of Township Supervisor for the Defendant Township.

18. Defendant Hildebrand took office in December 2012.

19. Defendant Hildebrand met privately with Plaintiff, and they engaged in various discussions about the Police Department.

20. Defendant Hildebrand asked for, and received assistance from Plaintiff in making personal introductions to local state and federal politicians in the area, with whom Plaintiff was very familiar from his many years as a police officer, Detective and Lieutenant and Public Safety Director at Benton Harbor, Michigan.

21. In January 2013, Michael Hildebrand, as the new Supervisor, decided to change the structure and membership of the police committee of the Defendant Township, against the wishes of Plaintiff.

22. The one female member of the 3 person Police Committee, (with the Berrien Springs Village president as the fourth nonvoting member) who had been on the committee for

many years, Susan Renton, was told she was off the committee and replaced with a male.

23. Plaintiff and Defendant Hildebrand disagreed over this ouster of the only female member, but ultimately Hildebrand got his own chosen people on the committee, Rich Albers, Don Damron, and himself.

24. The Police Committee had traditionally served as an advisory board only, providing input to the Chief about general operations of the police department, consistent with local ordinance and state law.

25. Defendant Hildebrand appeared to want to use this Committee to be able to interfere in the operation of the Police Department, and interfere in its enforcement of state and local laws.

26. In April 2013, a female, Katheryn Janetski contacted Rick Smiendendorf, Deputy Chief of Police, applying to become a "volunteer in police service," an unpaid position in which persons who did not have law enforcement experience could assist Township police officers in duties such as traffic enforcement, house checks, support at the Youth Fair and other supportive detail.

27. In May, 2013, Ms. Janetski was appointed by the Township as a volunteer in police service, an unpaid position, which required a background check, which was done by Deputy Chief Smiedendorf.

28. These volunteers wear uniforms, and are identified as volunteer citizen patrol officers for the Township.

29. In May 2013, Ms. Janetski did her first detail as a volunteer for the Girls on the Run at the Berrien County Youth Fairgrounds, along with part-time male officer, Mike Troup, and did a good job.

30. Janetski was told by Troup that she could call his cell phone number anytime she wanted to go on a police ride-along.

4

31.    Shortly after that, Officer Troup suddenly became very cold to her, and told her "things had changed" and he did not want to let her go on "ride-alongs" anymore.

32.    Berrien Springs Village President, Milton Richter, made several positive comments about Janetski's performance to Plaintiff, noting that he had a lot of good feedback by residents and business owners about Janetski's performance in the community.

33.    Ms. Janetski is a very physically attractive woman, very tall, blonde, very fit and in good shape.

34.    All the fulltime police officers at that time employed with the Township were white male, non-minority police officers.

35.    Sometime in June 2013, it became obvious that all the male officers, with the exception of the Plaintiff Chief and Deputy Chief, were shunning and ignoring Janteski whenever she came into the building.

36.    The officers would completely ignore her, or grunt in reply to questions from her, and turn their backs to her.

37.    Plaintiff was very concerned why the one female volunteer was being treated so poorly by his male officers.

38.    Plaintiff questioned one of the police officers, Rob Christner about why the officers were treating Janetski so poorly, Christner responded that the "wives" of all the male officers were angry that the Plaintiff had allowed Janetski to be appointed to the position because she was so pretty.

39.    Christner also noted a past relationship he had had with a male reserve officer's wife, and how that had created problems in the department and with his wife, and all the other wives, who were all close friends.

40.    Christner said that the "wives" were worried that such an attractive female being around their husbands would be too much of a temptation for them, and they did not want such a pretty woman employed at the department.

41. Plaintiff was quite upset to hear such a sexist and gender based statement, and told Christner that he and the rest of the officers better "get over it" and treat her like everyone else, because she was there to stay.

42. Officer Christner gave him a very skeptical reply, saying the other guys and he were never going to be able to treat her like a normal officer, and their wives would not allow it.

43. Early that year, and into the spring, Plaintiff presented a much more detailed year-end report of the Police Department than he had in the past, as there was a completely new Township board just elected at the end of 2013.

44. There were two fulltime vacancies for police officers in the spring of 2013, and one officer was planning to leave.

45. Plaintiff told the Police Committee that it would be more realistic to hire at least one permanent part-time officer, as the typical part-timers were fulltime with another police agency and they would be called off to their primary police department, which demanded a higher degree of loyalty, which was very disruptive and made it very hard to schedule them.

46. The newly constituted Police Committee told Plaintiff they wanted him to hire more part-time officers to avoid having to pay costly health insurance benefits, pension and overtime pay per their contract and the law.

47. Plaintiff told the Committee that the process of hiring, recruiting and training so many part-time officers was more expensive than having a permanent part-time officer, and that such officers were not as dependable as officers with primary allegiance to a different agency.

48. Plaintiff did a budget/plan showing the costs and expenses of such a proposal, and shared this with the Committee.

49. In the meantime, Katheryn Janetski came to Plaintiff, and asked if she could apply to

be sponsored by the Defendant Township to go through the Kalamazoo Police Academy, and if she successfully completed it, she would become a permanent part-time officer for the Defendant Township (exclusively) and she would reimburse the Township for the training costs.

50.     In order to go through the Police Academy and become a sworn, Michigan Commission On Law Enforcement (MCOLES) certified officer in the State of Michigan, Janetski had to have a law enforcement agency sponsor her, in lieu of having a certain number of college credit hours.

51.     Historically, the Defendant Township has sponsored white male police officers to attend police academy, the cost of which was then supposed to be reimbursed by the officers when they became full or time part-time officers, but then, most of the officers were not ever required to reimburse these, which Plaintiff knew.

52.     Plaintiff believed that Janetski would be a very good police officer, and urged her to apply and make a proposal to the Police Committee to do this.

53.     Ms. Janetski was attending pre-test physical training for entrance to the Academy at her own cost, in Kalamazoo.

54.     Plaintiff spoke to the head of Kalamazoo Police Academy Larry Belen about her, and he advised Plaintiff that she was very a promising candidate, but that he had to make a decision soon, as the entrance for the class deadline as closing soon, as the academy would begin in August 2013.

55.     In June 2013, Janetski made a presentation to the Police Committee, Albers, Hildebrand, Damron and Milt Richter, as well as Village general counsel, Robert Landgraf, and Plaintiff about her desire to be sponsored by the Township for the police academy, and in return, agree to become a permanent part-time officer and even reimburse the Township for her tuition.

56.     It is unknown if this meeting was recorded anywhere by anyone present.

57.     It lasted 20 to 30 minutes, and did not go very well.   The male committee members spoke very condescendingly to her, and asked her many questions about her pending divorce from a much older man, whether it or not her family life would allow her to do the police job.

58.     The Board members told her she should go to the local Berrien County Sheriff's Reserve Academy first, to see if she would really like police work, and acted skeptical if she could even possibly handle the rough and tumble of police work, and questioned whether she would even likely stay in the area due to her family issues.

59.     After she left the meeting, Village President, Milt Richter, a member of the committee made comments about how good looking Janetski was in her uniform walking around downtown, and how he could not "say anything bad about that" expressing his approval of her physical appearance.

60.     Plaintiff told Hildebrand and Albers that his statements were sexist, and inappropriate, and that one of them needed to remind him to not make those sorts of comments about female officers, volunteers or employees.

61.     The Reserve Academy is a traditional low tech, minimal course of law enforcement training that does not lead to MCOLES certification, which only meets 1-2 nights a week and some weekends for some months.

62.     After the Police Committee meeting with the presentation by Janetski, Defendant Hildebrand told Plaintiff he had "rubbed the board members the wrong way" by bringing her to the meeting and encouraging her to apply.

63.     Plaintiff did not agree with the Committee's decision, and knew she was more than qualified to do the actual full Kalamazoo Police Academy, but did what he was told, and sent her to the Reserve Academy, which required a more in-depth background check.

64.     Susan Renton, the Township clerk, contacted Plaintiff and let him know that

8

Defendant Hildebrand was doing his "own" background check on Katherine Janetski, but she did not know how, or by what means, but that Defendant Hildebrand had said in front of her (clerk) and two other people, at the Township Hall, "...how do we know she (Janetski) isn't just divorcing that guy because he had a stroke, and he cannot get it up anymore and she can't have sex with him…"

65. Plaintiff was furious that Defendant Hildebrand would have said such sexist and inappropriate things about any officer candidate in front of Township employees, or go outside the normal established departmental background check to look for such irrelevant personal information.

66. Plaintiff called Hildebrand on his cell phone to confront him, and demanded to know why he was doing his own background check, and why he had said this.

67. Hildebrand did not deny making the statement, he just said he had to make sure that all his police officers were "on the up and up."

68. Plaintiff told Defendant Hildebrand that there were procedures in place to perform employee background checks, and that the candidate's gender, sex life, divorce and personal issues were not relevant to whether or not she would make a good police officer, and that they had to follow the established procedures to avoid violation of any candidates' civil rights, or any laws, and avoid the Township being sued for gender discrimination.

69. Hildebrand argued that he was right, and disagreed with Plaintiff, and ignored the law, and told him he could do whatever he wanted. The phone call was heated.

70. Janetski authorized her divorce lawyer in Montana to contact Plaintiff, based on comments to the Police Committee to reassure him that she was not some kind of bad woman, because she was married to the same man, who while older than her, had been married for over 20 years. Plaintiff thought it was unnecessary and intrusive, but followed up as instructed.

9

71. Janetski did go into the Berrien County Sheriff's Department Reserve Academy, as the Police Committee approved, quit her PT training in Kalamazoo, and got a job as a clerk in a grocery store to pay her bills since she could not afford the Kalamazoo Academy on her own.

72. Janetski did very well at the Academy, and all indications were that she would complete it successfully.

73. Janetski also continued to volunteer as a volunteer officer for the Defendant Township department while she was in the Reserve Academy, and would come into the department to get flashlights and other items needed for the academy, and the other male officers refused to help her, speak to her and ignored her.

74. While the atmosphere was tense, and the male officers obviously disliked a woman being there, Janetski, Plaintiff did not have sufficiently sexist or specific comments or behavior by them to allow him to take disciplinary action under their union contract, also, Plaintiff's chain of command for taking action due to gender or other illegal discrimination was to go to Hildebrand or the Police Committee again, all of which were obviously biased against Janetski due to her gender, as already expressed.

75. Plaintiff did create an internal memo, that reminded officers to behave appropriately, avoid off color comments.

76. In August, 2013, due to multiple concerns about the manner in which the Police Committee was interfering in the operations of the police department, a board member, Robert Krause asked labor counsel, for the Defendant Township attorney Bruce A. Sucher, to draft a legal opinion, which was reduced to a writing, and then distributed to the Township Supervisors outlining the legal duties of the Police Chief based on local ordinance, and his employment contract.

77. Krause did not consult with Plaintiff about his request to attorney Sucher.

78. Plaintiff also sought a formal, written legal opinion about the application of a female

10

(which was Katheryn Janetski) to become a police officer by being sponsored through the academy, and how the Police Committee had handled that, and the potential for litigation by the female officer for gender discrimination under state and federal laws due to gender bias, since males had been treated more favorably in the past in terms of hiring conditions.

79. Labor counsel for the Township, Sucher provided the written legal opinion about avoiding gender discrimination liability and unlawful actions at Plaintiff's request, dated August 8, 2013, outlining his concerns about evidence of gender discrimination in the hiring process related to Janetski, referred to in the letter as a female volunteer.

80. Plaintiff forwarded Township attorney Robert Landgraf a copy of the Sucher letter about the female applicant when he got it.

81. Landgraf sent Plaintiff an email, and asked about some facts in one part of the letter, and the two discussed it by phone.

82. At the August, 2013 Police Committee meeting of Defendant Board, labor counsel Bruce Sucher presented his opinion to all present and Hildebrand was very angry, that Krause had consulted with labor counsel without advising him, and upset that attorney Sucher gave him the opinion without contacting Hildebrand first.

83. Krause defended his actions as appropriate, and attorney Sucher noted that he represented many townships and councils and he has never had any requirement to only proceed through one person on a Board or Township council, and he simply gives the advice he is asked to give.

84. Defendant Hildebrand demanded a closed session under the Open Meetings Act when he first saw the Sucher letter, Plaintiff objected to that, saying it was inappropriate as Kraus and Renton were part of the matter, but attorney Landgraf said Defendant Hildebrand could close it, and he ejected Kraus, Susan Renton, Katheryn Janetski, and some members of the public.

11

85.    Then, Plaintiff started to pass out the August 8, 2013 opinion letter entitled "The Female Applicant Berrien/Oronoko Township Police Department" authored by Bruce Sucher, which also enraged Hildebrand.

86.    The meeting lasted 1-2 hours, and Hildebrand, Don Damron, Rich Albers all denied having said anything about Janetski's family life or gender in the interview, and they also denied that any of them ever said she could go even go to the Reserve Academy, as they had said, and as the Plaintiff sent her to do.

87.    Attorney Sucher went through his recommendations as outlined in the letter, and advised the Township Supervisor and all present that the Township was risking a high likelihood of legal liability under Title VII of the Civil Rights Act, and Elliott/Larsen Civil Rights Act if they were to refuse the female applicant a position or an opportunity to go to the Police Academy, as they had for similarly situated male police officer candidates in the past.

88.    Sucher also noted that this same female applicant had also applied for the Michigan State Police for an officer position, and had agreed to forgo that if she got the position with the Township police department, and that would be a large measure of damages she could use to argue her position in a discrimination suit.

89.    After the meeting ended, Landgraf told Plaintiff that he thought the meeting went really well, and that he agreed with Sucher and that his opinions were well taken, and that Plaintiff really did allow the Board to interfere too much with police operations.

90.    Janetski continued in the Reserve Academy through November, but it appeared that the Michigan State Police were very interested in hiring her.

91.    In 2013, Plaintiff consulted with labor counsel for the Defendant Township, Bruce Sucher, to ensure that the Police Department had a proper, lawful employment/hiring process for police officers that protected any applicants' civil rights to the fullest, and they developed a new hiring policy during the summer, using Michigan Municipal

12

League materials.

92.    In September, 2013 the department put out ads looking to hire fulltime and a part-time police officers, and placed them on the Michigan Association of Chiefs of Police website and the department website, as two officers had left employment.

93.    This was circulated to MCOLES, Michigan Association for Chiefs of Police, and placed on the Defendant Township's website.

94.    In approximately July 2013, Plaintiff told Township attorney Robert Landgraf that he felt that Hildebrand and the Board had created a hostile work environment for him due to his opposition to the manner in which they were treating Katheryn Janestki at the June meeting, and the entire hiring process for the female officers, and ensuring diversity in the agency.

95.    Landgraf asked Plaintiff for his permission to tell Hildebrand that, and Plaintiff said he wanted him to do so, and that's why he told him, as he wanted the hostile work environment and gender discrimination to stop, and that he wanted them to treat Janetski fairly and in accord with the law, and let him diversify the employees of the police department.

96.    Plaintiff also told Board member Damron that he felt Defendant Supervisor Mike Hildebrand had created a hostile work environment for Plaintiff by interfering with his hiring process of police officers, in particular his efforts to diversify the department by race, gender and ethnicity, and that Hildebrand was opposing it.

97.    Plaintiff spoke strongly to the Police Committee on multiple occasions in 2013 that he wanted to diversify the gender and racial make-up of the police department, as it was all white male officers, and white female clerical staff only, and had been that way for years.

98.    Plaintiff noted that their part of Berrien County was extremely racially diverse and that they needed to increase the number of minorities on the department, and that the only

way to do it for a small department, would be to pay for minority candidates to obtain their training if at all possible, which is why their opposition to the hiring of Janetski made no sense.

99.    Defendant Hildebrandt refused to speak to Plaintiff at all after he made the complaint of a hostile work environment, and refused to return his calls or emails.

100.   Suzanne Renton, the Township clerk came to Plaintiff in early September 2013, and she demanded that Plaintiff agree to a meeting with Landgraf, Hildebrand and at her house to discuss his claims of "hostile work environment."

101.   Plaintiff said that he was living in a hostile environment created by Hildebrand due to his efforts to enforce the law, and that his refusal to communicate with him, and constant interference with his attempts to hire a qualified female applicant or any minorities, was making it worse.

102.   Renton told him Plaintiff should never have complained about any hostile work environment and also that he should stop "throwing the employment contract in their face" all the time too, because that is why Hildebrand was upset with him.

103.   Plaintiff refused to attend unless he could be there with his own attorney, and she made it clear that would not be acceptable, ever.

104.   Plaintiff suggested they include Board Member, Bob Krause in any such meeting and started to call him, she got up angrily and demanded he stop, and that Krause would not be allowed.

105.   Plaintiff suggested a compromise meeting, with Krause in attendance, if he could not have his own lawyer there, and that he wanted to think it over.

106.   Renton ended the meeting.

107.   Plaintiff called her later, and said he would come, but with a lawyer, and if they included Krause, and she said "bless you.." and hung up.

110.   On September 20, 2013, Plaintiff attended this meeting, with Bob Krause, Landgraf,

14

Suzanne Renton and Michael Hildebrand, and digitally recorded the 3 hour session.

111.    This long and difficult meeting made clear that Hildebrand was angry about the new hiring process Plaintiff had set up, would and did totally deny the sexual comments he made about the female applicant, denied that Plaintiff had confronted him on that, and denied that he was upset about the Sucher opinions and his efforts to diversify the agency, and how those were presented to the Board.

112.    Nothing was resolved, and Plaintiff left feeling very uneasy about what would happen in the future, and that the issue was not resolved, nor would the hostile work environment end.

113.    There is a long history of sewer and water project problems in the local community, and extending lines into the Township-the authorization of which involved the ultimate recall of the entire prior board but one, and litigation by the Village of Berrien Springs against Oronoko Township and a $500,000 settlement payment.

114.    When Hildebrand was not yet a Township Board member, in 2010, he had pushed a referendum to authorize a sewer and water project to extend lines from the Village of Berrien Springs, but it was defeated.

115.    Plaintiff had worked with Hildebrand before he was elected Board President in 2012 to try and get various sources of state, federal and local private funding to extend the water and sewer to Oronoko Township without requiring a high millage, or high cost to the taxpayers.

116.    There was also a movement to build a $17 million Expo Center, with an indoor horse/animal arena, with space and seating for concerts and other community activities at the site of the Berrien Springs Youth Fair, tied into the campaign to raise funds for the sewer project, as this could not proceed without the extension of the lines.

117.    Plaintiff lawfully used his longstanding ties and connections to various state and

federal and private entities and groups, and knowledge of the grant processes to work hard to find a way to extend the lines with minimal cost to the community.

118. Hildebrand welcomed Plaintiff's help with this project until Plaintiff objected to what he believed were deliberate misstatements of fact about the requirements of the Michigan statutes Hildebrand made to the public as various community "listening sessions" in February 2013.

119. The controversy in the past had revolved around how to pay for the project.

120. The Michigan statute involved, MCLA 333.12753, required that the members of the public had to hook up to the new system within 18 months of notice, or completion of the project, whichever came first, and during a listening session in February 2013, a slide presentation was made by Hildebrand in which slide 11 showed an excerpt of the statute with some words enhanced, to make it appear as though the township could waive this requirement on its own, without agreement from the Village of Berrien Springs.

121. Plaintiff objected to this as being a misrepresentation to the public, and took it up with Defendant Hildebrand and other privately after this meeting, and consulted with a fundraising consultant for his opinion as well.

122. Hildebrand told Plaintiff to stay out of it and keep his mouth shut as he would not have the Police Chief questioning his interpretation of any law.

123. Hildebrand then ordered Plaintiff to have no involvement with working on the sewer and water and Expo arena project, even in his private, individual capacity.

124. After Mike Hildebrand became Township supervisor, Plaintiff received complaints from some residents that building was being done without appropriate permits being obtained, and that the building inspector was giving favor to some local citizens and contractors, or waiving building permit requirements based on favoritism as opposed to following the local ordinances.

16

125. Plaintiff went to Defendant Hildebrand to note these concerns, and was told to stay out of it, not enforce the law, and he would do what he wanted.

126. In the late summer of 2013, Plaintiff then had non-uniformed VIPs, or department volunteers conduct background investigations of applicants, using Michigan State Police background check process.

127. Because of his concerns that the Police Committee would not permit Plaintiff to handle the oral interview process free of gender, racial or any other illegal bias and illegal behaviors, Plaintiff set up a uniform interview process to be done by officers from other jurisdictions to do it, in lieu of the Police Committee.

128. The interview committee consisted of one woman, and three men, including Rich Albers, who was selected by Mike Hildebrand.

129. The top pick of the applicants and recommendation of the committee, and Plaintiff's own oral interviews was a female, Anna Stutz, who was hired a fulltime officer, and two part time positions were filled with white males.

130. On November 18, 2013, Plaintiff "pinned" Janetksi upon her successful graduation from the reserve academy.

131. Plaintiff recommended the new hires and the Board agreed to them, and Plaintiff pinned Stutz and Matthew Opperwall as well.

132. Had Janetski been permitted to attend the Police Academy as she and Plaintiff requested in June, she would have been eligible to apply for those open positions and available to be hired at that time.

133. Under the so-called "Hazwopper law" "MIOSHA Hazardous Emergency Plans," both federal and state laws, MCLA 408.1024, Michigan Public Act, 154, 4080.1014(i) and 42 USC Sec. 6901, Resource Conservation and Recovery Act (RCRA), and Superfund Amendments and Reauthorization Act of 1986 (SARA) Title III, all require the local fire chief to prepare and disseminate to each firefighting employee a plan for

17

executing the department's responsibility with respect to each site within the fire department's jurisdictions where hazardous chemicals are being used or produced.

134. These plans had to be done annually, and the Fire Chief, Bruce Stover was to do them, but he did not, therefore, the Township was out of compliance with state and federal law and risked substantial fines and civil penalties.

135. Throughout 2013, Plaintiff notified two of the Board Members, Hildebrand and Renton that the Fire Chief had not done the plans as required by the state and federal laws, and that they needed to be completed, and that the citizens, officers, and firefighters were being placed at risk because there were no plans.

136. They all ignored his warnings, and told him to stay out of the Fire Department's business.

137. Such a plan was required for the Andrews University Andrews airport, and all the many schools within the township but never done.

138. The Village President, Milt Richter retorted that "as long as the fire department comes when my house is on fire that's plan enough for me."

139. Plaintiff had also met with the police chiefs at Sandy Hook elementary in Connecticut and Aurora, Colorado at an IACP meeting about having clear, detailed active shooter plans, and made a presentation to the Board about obtaining their own, and he was ignored.

140. On February 3, 2014, Suzanne came to Plaintiff in his office and told him that if he did not "…back off," he will lose his job, as he is losing the trust of the police committee and the Board, and if he does not get into line, he will be gone.

141. Plaintiff was shocked, and did not understand why she was bringing this forward, and demanded that they contact Hildebrand right away to discuss it.

142. They went to the James White library at Andrews University to talk, at Renton's request.

18

143. This meeting also lasted approximately 3 hours, and Hildebrand accused Plaintiff of putting Katheryn Janetski and another volunteer officer, Will Miskiewicz, who had a duty related injury that made it impossible to work fulltime, up to making FOIA requests for their files, and that "the puzzle pieces were all fitting together and made sense" and he had connected the dots back to Plaintiff.

144. Hildebrand accused Plaintiff of trying to stir up trouble and complaining, and by having these volunteers request their files and/or public records, even though these were lawful requests.

145. Hildebrand told him that Plaintiff had rubbed board members the wrong way by bringing Janetski into the department as a volunteer and the same was said about Will Miskiewicz, a former fulltime officer, then disabled from full duty, who had some longstanding FOIA disputes with the Township, being allowed to be a volunteer for the police department.

146. Hildebrand told Plaintiff at this meeting that he, the Plaintiff had to fire attorney Bruce Sucher as counsel for the Township because he had four negative experiences with him (all in which Sucher told him he could not violate the law or had to do things differently to comply with the law) and he "had to go."

147. Hildebrand told Renton to consult with Township attorney Landrgaf to find new labor counsel.

148. Hildebrand told Plaintiff very ominously that "he had better fix this" or he would be in trouble, and made it very clear that these two volunteers had to be fired or he would be next.

149. Hildebrandt also told Plaintiff he was very unhappy with his association with a group called ALPACT, as co-chair of the association of the United States Attorney's Office and the Michigan Department of Civil Rights, to help law enforcement agencies to build trust with community groups to develop positive communications with minority

groups around the state.

150. Plaintiff had announced to the Police Committee that he had been made co-chair of ALPACT and had gone to the Michigan Hate Crimes conference in Lansing, along with the State of Michigan Department of Civil Rights Director, in part because of their racially diverse region, and his history as Police Chief in Benton Harbor, a primarily African American and minority community.

151. Hildebrand made clear at the Board meeting where that was announced that he thought this was a bad thing, a waste of time, and questioned why he was wasting his time as Chief doing such things.

152. Hildebrand and Renton summoned Plaintiff for a meeting to review his evaluations from the prior year and discussed his goals for 2014.

153. They set goals, and reviewed his generally favorable evaluations.

154. But, Hildebrand insisted that morale was low at the police department, and that he had heard generally negative things from officers and others, and that Plaintiff needed to work to form a better relationship between the Board, the Police Committee and the officers, and that they had suggestions for how to do so.

155. After much discussion, Hildebrand tentatively agreed to have an IAACP (International Association of Chiefs of Police) member, a chief from another state, come in to do an assessment and evaluation of the police department and set goals for the future, at no cost to the agency.

156. Hildebrand and Renton called Plaintiff in on Monday, February 10, 2014 and showed him Hildebrand's own analysis and summary of his performance evaluations form 2013, and said that he had goals and objectives for the Plaintiff on his computer.

157. Plaintiff told them that not was how a police chief or department should be evaluated, and shared with them some professional police organizations publications on same.

158. Hildebrand told Plaintiff he did not like how Plaintiff was a member of so many

professional law enforcement organizations and associations, and that these activities were interfering in his ability to get his job done timely, and he was not devoting enough time to his police duties.

159. Hildebrand also criticized his membership in the Saint Joseph, Michigan Rotary Club, because it was not in Berrien Springs.

160. Hildebrand made it clear that his various political and public policy organization memberships and high level official positions "annoyed and bothered" people, and the public because it took away from his job as Police Chief and because of his association with controversial causes.

161. Plaintiff reluctantly said he would resign from whatever group he had to keep his job, as he needed his job to provide for his family.

162. Hildebrand insisted that none of these groups he belonged to helped anyone in their community, and Plaintiff told him that the high level of migrant workers and minorities in their township made it very helpful for the Police Chief to belong to such entities to help make relationships stronger between minorities and law enforcement and prevent crime by minorities.

163. Plaintiff understood that Hildebrand wanted him to cease his outside civil and charitable professional societies because they did not square with his own views about how minorities and police agencies' need to interact.

164. A vague comment was made by Hildebrand about "stealing gas" and Plaintiff explained that he used his personal car as a police vehicle and instead of putting in for mileage reimbursement, he had been given a gas privilege by the previous board.

165. Plaintiff very reluctantly told volunteer officers Janetski and Miswieski they were let go on February 11, 2014, the next day, even though he did not want to do it, because Hildebrand had made it clear that if he did not, Plaintiff would lose his job instead.

166. On February 11, 2014, Hildebrand emailed Plaintiff and told him that the Board had a

special meeting and hired Peter Letzmann, the same person, an attorney/consultant who had been hired to fire the prior Police Chief.

167. Plaintiff did his best to take the high road, despite his concern that Letzmann had been simply brought in to fire him, and authored a letter to Peter Letzmann to invite his assessment of the Police Department dated February 14, 2014, as he was invited to meet with Letzmann and some of the board members on February 14, 2014 in the supervisors' office to discuss how the assessment of the agency was to proceed.

168. Plaintiff was told that the persons at the meeting would be Board Member/Trustee Krause, Suzanne Renton, Supervisor Hildebrand and Peter Letzmann.

169. Plaintiff asked Krause by phone why he was going to be there, since he was not on the Police Committee, and he told Plaintiff he did not know why, as he was just told to be there to hear how Letzmann would proceed with assessment.

170. Letzmann was hired by the Board in a late night closed session on February 11, 2014.

171. Upon information and belief, Hildebrand called this meeting by telling the Board that the reason for hiring Letzmann was to uncover problems and issues at the police department that Hildebrand said were caused by Plaintiff, and he clearly was targeting Plaintiff for termination, and some of the members did not agree with this plan, since Hildebrand wanted a unanimous vote to hire Letzmann, it then became a vote to have Letzmann do an assessment and review of the operations of the police department generally.

172. Plaintiff arrived at the February 14, 2014 session, and Peter Letzmann told him, in front of Krause and Renton that the usual 3 reasons evaluations and reviews like this one he was hired to do of police agencies were for 1) corruption, 2) mismanagement, incompetence, or lack of management 3) confidence trust the bosses have in an employee-like him.

173. Letzmann said that the No's 1 and 2 reasons were not at issue, as there were no

22

allegations of corruption, or mismanagement or conversation about incompetence or poor management.

174. However, Letzmann said that reason No. 3 was implicated in this case, and that some board members had lost trust, confidence and belief in him, and that's why he, Letzmann was hired, to get to the bottom of it.

175. Letzmann then told him that he could not divulge what had been said by whom in the closed meeting, but that the vote to hire him to do this assessment was 7-0, implying clearly that the whole board had lost faith in him as a Chief.

176. Letzmann claimed that he had no preconceived notions of how the assessment was to turn out, but that he knew that these things were and would bring "discomfort " for him, and the community.

177. Letzmann then went on a long story about his time as a lawyer for the City of Detroit where he and Coleman Young had some disagreement about cases involving the City and its police, so Letzmann left because the city was not big enough for the both of them, and he (Letzmann) did not want to end up in the worker's comp department or something.

178. Mr. Letzmann was doing his best to impress upon Plaintiff how powerful, smart and well-connected he was, and told him he then became the Police legal advisor for the City of Troy, Michigan and was there for many years.

179. Letzmann claimed he would do a forensic financial audit, looking for payment for things without proper paperwork, a detailed inventory of department equipment and property and looking at discipline logs to determine whether or not he was treating everyone the same, or had a favorite, his organization schedule and manpower management, completely negating his prior comments, only minutes before, that No. 1 and 2 were not implicated.

180. Letzmann also told him that the Board was upset about written legal opinions given to

23

him by labor counsel, Bruce Sucher, and blamed Plaintiff for it, but he claimed to not know what the opinion was about-but clearly referring to the opinions about the female applicant and the scope of authority of the Police Chief done in August of 2013.

181. Letzmann then ominously told Plaintiff that there were "very serious laws" about how township property was to be disposed of, and when Plaintiff asked him what he was referring to, Letzmann told him, "your rolling stock…" referring to the MWRAP, the former military vehicle that was lawfully awarded to the agency through the military loan program of excess property.

182. Plaintiff noted that the township did not actually own the MWRAP, and that he followed the federal rules and law about transferring the vehicle at the request of the Berrien County Sheriff Department and there was nothing done wrong.

183. Letzmann then suddenly said "Would you consider resigning?" which took Plaintiff off guard.

184. Letzmann did not let him respond and continued on by saying, "…we would give you a recommendation, there would be no adverse action taken by the board, and we would let you write your own letter about all the good things (he) had done for the community since you had been chief…"

185. Plaintiff said he refused to resign, and Letzmann demanded to know why.

186. Plaintiff said that he would find no wrongdoing during his assessment of the agency, therefore, he would not resign.

187. Letzmann commented on the written employment contract Plaintiff had with the Township, and its "just cause" provisions, and referred to the evidence of "Milt's fingertips…" on it, since it looked like the type of thing IACP would write up, inferring some bad action by Plaintiff in drafting a contract for himself-even though the Township had signed it and amended it periodically, through Township attorney,

Robert Landgraf.

188. Letzmann noted that he knew his contract required just cause and arbitration to fire, and Kraus then said, so even if Milt went back to patrol as he could if there is no just cause, you'd probably fire him anyway and Letzmann said, "…that's probably true…"

189. Suzanne Renton said then, if a vote was taken right then on the Board, they'd vote 4-3 to fire him.

190. Plaintiff asked for specific reasons or events that would constitute just cause for his termination under the contract, and when they refused to give him any examples, he said if they fired him, he (Plaintiff) would win at arbitration.

191. Letzmann then asked if Plaintiff had ever been through an arbitration, and Plaintiff said yes he had, on both sides of the table, many times, and was confident he would win.

192. Letzmann said that he should not be so sure about that, as Letzmann had a great personal track record of winning his arbitrations, and Plaintiff replied that he had too, and he was ready.

193. Letzmann said the Board had lost significant trust in Plaintiff, and he offered the resignation to him as a "decent human being" to avoid tearing the community apart and get a workable solution.

194. Letzmann told him that there two paths to take, one was resignation, the was to let him come up with the evidence for "just cause."

195. Letzmann told him if he resigned as he was demanding he do, it would be done in closed session, and it would not be done in public, otherwise, he would have to go forward with the full assessment as planned, and it would all be made public, and his otherwise excellent career in law enforcement, and high profile good reputation in the International Association of Chiefs of Police would be ruined by the terrible things he was certain he would find if did the assessment.

25

196. Plaintiff told him that he would not find anything, nor would he find just cause to terminate him under his contract.

197. Letzmann said they would also pay him some severance pay, like a "house in Hawaii.." if he would resign, and kept referring to the price of some big house in Hawaii as an inducement to leave his job, but when he saw that Plaintiff was writing that down, he said he was kidding about a house in Hawaii.

198. Letzmann then said he likely would have to really "sell" his resignation to the Board, it was not a sure thing so he better think hard about it.

199. Letzmann told him he would interview every person in the police department in an effort uncover some wrongdoing by Plaintiff, and that he "hoped he did not have to use Garrity" referring to the well-known case law invoking criminal sanctions and threats in the investigation of police officers.

200. It was made very clear that Letzmann was threatening possible criminal prosecution of Plaintiff could result if he did not simply resign immediately.

201. At that moment, Plaintiff could not take the abusive bullying anymore, so handed Suzanne Renton his doctor's slip staying that he needed time off work due to a chronic illness, and Letzmann asked if the Township knew what his medical condition was.

202. Plaintiff said he did not know if they did or did not, and Letzmann said "reading between the lines, I see some stress issues here…"

203. Plaintiff told Letzmann to get him his schedule of interviews of the employees and to just go do his assessment.

204. Letzmann demanded of him "… are sure you don't just want to resign quietly?"   And Plaintiff said no and left.

205. From June, 2013 forward, after the dispute with the Police Committee over Kathryn Janetski's application to become a reserve police officer, and the actions Hildebrand took about the legal opinions of Sucher, Plaintiff had become very stressed and

anxious about what was going to happen him and the daily anxiety he was suffering.

206. Plaintiff had experienced many violent crime scenes and other traumatic events over the course of 30 years in law enforcement, so that he had developed PTSD, or Post Traumatic Stress Disorder, but it had been asymptomatic until he was forced to violate the law in his position as Police Chief, both as to employee civil rights, hazardous waste laws, as well as gender discrimination and basic constitutional rights of citizens.

207. His symptoms came back with a vengeance.

208. He had severe panic attacks, could not sleep, felt trapped in his own home, lost over 85 pounds, developed oozing sores on his arms and legs, was jittery, depressed, and what felt like severe heartburn, or a heart attack, so badly he felt he could not drive.

209. Plaintiff's chronic blood pressure, usually well controlled with medicine, became incredibly high, and he could not control it with medications despite his internal medicine doctor's many changes in his prescriptions.

210. As events in his workplace progressed from the summer of 2013 through to February 2014, Plaintiff became worse and worse mentally and emotionally and physically, and could not sleep at all, and he eventually was referred to a psychologist for treatment, and he is now on multiple medications for depression and anxiety and PTSD symptoms.

211. Plaintiff has now been determined to be unable to work as a Police Chief, or any fulltime position, due to his severe emotional distress and anxiety, and PTSD due to the various illegal actions of the defendants.

212. Plaintiff advised Township Attorney Robert Landgraf of what he believed was his worsening work related medical issues before Letzmann was hired, and Landrgaf urged him to file a worker's compensation claim, which he did, and then the Township denied it.

213. After the first meeting with Letzmann, Plaintiff has been off work and using his

accumulated sick time lawfully, based on multiple doctor's orders that he not return to the hostile workplace which elevates his blood pressure, and causes severe anxiety and distress, and PTSD symptoms and his relationship with his spouse has been harmed.

214. Plaintiff has been advised by current employees and local friends and contacts that Letzmann has been trying hard to "dig up some dirt" on him, in order to allow the Defendant Hildebrand to fire him "for cause" as outlined in his employment contract, and/or failing that, finding some illegal or immoral wrongdoing by Plaintiff in his position as Police Chief in order to frighten him into resigning to avoid negative publicity.

215. Plaintiff simply cannot return to a workplace where he is compelled to violate state law, local ordinance and federal law, as the chief law enforcement officer of the township.

216. The constant harassment, threats and berating by Hildebrand, and now by his hired, contracted agent, and that of the Township, Peter Letzmann, to frighten Plaintiff and his family into submission and resignation from his employment is being done with malice, and intent, and is based on untrue or misrepresentations of fact and law.

217. Plaintiff followed his chain of command, and procedures to report illegal gender discrimination, and violations of state, federal and local laws, and was vocal in the community about these issues.

218. Plaintiff had warned Hildebrand he would have to report many of these violations to the public authorities beyond the Township, including the Michigan Department of Civil Rights and the federal EEOC, and possibly MIOSHA, and Hildebrand retaliated by interference in running the Police Department, and trying to find a way not only to fire him, but ruin his long career as a law enforcement and fire safety professional.

219. In the past several weeks, Letzmann and Hildebrand have told various members of the police department, Township employees and others of false allegations that Plaintiff

broke the law by obtaining the military vehicle, the MWRAP, and that he may have "stolen" from the Township, or that his wife, while working as a volunteer and cadet coordinator, may have been improperly reimburse for supplies.

220. Letzmann has persistently done what he told Plaintiff he would do, and that is to find "something" he can help the Township to use to illegally fire/terminate him as opposed to simply conduct a legitimate, objective assessment of the functioning of the police department.

221. No reasonable person could possibly function in their position of employment under such conditions, and as such, the Defendants have worked together successfully to make Plaintiff's ability to work in his position, or even in law enforcement impossible, and have ended his career.

## COUNT ONE: FIRST AMENDMENT VIOLATION UNDER SECTION 42 U.S.C. 1983 as to PLAINTIFF'S RIGHT TO FREE SPEECH

222. Plaintiffs hereby incorporate paragraphs 1-221 as if fully reincorporated herein.

223. Plaintiff is and was a public employee at the time of all events as outlined above.

224. Plaintiffs spoke out on matters of public concern, specifically, as to the illegal and discriminatory and retaliatory actions and performance of individually named Defendants and the actions and policies of the Defendant Oronoko Township Board of Trustees, and Defendants Hildebrand, Letzmann.

225. Plaintiff spoke out frequently on numerous matters of public concern about the discriminatory and illegal actions of Defendants, from March 2013 through to February 14, 2014, his last day of active work, both individually as public officials and as agencies of the government.

226. In direct retribution and retaliation for Plaintiff's opposition to Defendants' policies and actions, Defendants then deliberately worked to wrongfully force Plaintiff out of his

29

position as Police Chief, by false accusations of impropriety in his office, including alleging, falsely potential criminal actions.

227.    These unlawful actions were undertaken by all individual Defendants acting under the color of state law in their official capacities.

228.    The actions of Defendants have culminated in the constructive discharge of Plaintiff Milton A. Agay from his position as Police Chief of Berrien Springs/ Oronoko Township.

229.    The actions of Defendants have caused materially adverse employment actions against Plaintiff Milton A. Agay as well as his constructive discharge.

230.    Plaintiff Milton A. Agay was told at the meeting with Letzmann and Renton and Hildebrand and Krause on February 14, 2014 that he could either choose to resign, or be tarred and feathered in public for false accusations of financial, fiscal, legal, ethical and even criminal misconduct in his position as Police Chief.

231.    Plaintiff refused to resign, and invited them to performance a true assessment of the Police Department if in fact that was their plan, as opposed to simply making up or trying to find something Plaintiff had done wrong during his time as Police Chief in order to fire him "for cause," to end his employment contract and deny him his benefits and status or worse yet, get him criminally investigated and end his law enforcement career in a very public, humiliating manner.

232.    Plaintiff has taken his accrued sick leave, and provided his medical doctor's notes placing him on off-work status since February 14, 2014, and complied with all the terms of his duties.

233.    Defendants have simply engaged in a scattershot, intense and very public interrogation

30

of members of the Police Department, past and present, Township employees, local citizens and business owners and others for the past 2 months, in the guise of an "assessment" of the Police Department, and shown no signs of real interest of returning Plaintiff to work.

234.    As Plaintiff has not been officially fired, he does not have any payout of accrued sick leave and other benefits, but his doctors have made it clear he cannot return to work as Police Chief due to the intensely hostile work environment he has endured, being forced to break the law, and close his mouth and silence his opinions and knowledge about unlawful actions of government officials in order to keep his employment.

235.    Despite being advised that Plaintiff is too ill to endure another grueling sham interview, and being represented by counsel, Letzmann has asked for another chance to "interview" him about various issues while he is on sick leave, even threatening him May, 1, 2014 by saying (erroneously) that he had a carte blanche "order" from the Board to force him to meet with him, Friday, May 2, 2014, despite his severe and serious medical conditions, and his doctors' orders that he not attend any such meeting, and various procedural and legal barriers to forcing him to do same.

236.    Plaintiff Milt Agay's speaking out publically and (directly to) against and about Defendants in their actions as public officials in opposing their various unlawful conduct, all matters of public concern, including discriminatory illegal actions and management and/or discrimination on the basis of gender was the only or substantially motivating factor for Defendants' actions in various adverse actions taken against Plaintiff and denying him material employment opportunities and constructive discharge, as outlined above.

237.    The materially adverse, retaliatory employment actions taken by Defendants were

31

injurious actions that would likely chill a person of ordinary firmness from continuing to engage in that activity, and would not have been taken but for the Plaintiff's public comments on matters of public concern, and private opposition to Defendants, and to be silenced for same.

238.     As such, Defendants actions violated Plaintiff's well-established right to free expression under the First Amendment to the United State Constitution and to enforce his civil rights and those of his female employees, volunteers and citizens of the Township to be free of gender discrimination and their right to be free from retaliation in exercise thereof.

## DAMAGES

239.    Defendants' actions and omissions, negligence and intentional conduct as outlined above, paragraphs 1 through 238 has resulted in damages to Plaintiff Milton A. Agay as follows:

    a) loss of his job, destruction of his law enforcement career,

    b) extreme mental and emotional suffering, past, present and future,

    c) embarrassment, humiliation, past, present and future,

    d) consequential damages, past, present and future, including loss of seniority, pension accrual and benefits,

    e) attorneys' fees and all allowable litigation costs,

    f) and all damages provided for under federal and state law, as well as

    g) constructive discharge .

## REQUESTED RELIEF

240.    WHEREFORE, the Plaintiff seeks all appropriate damages arising out of law, and

claims in equity and fact for each or all of the above Counts where applicable and hereby requests this Court to award the plaintiff all applicable damages, including but not limited to compensatory, exemplary, and/or punitive and all other relief available to him including but not limited to:

a.    all appropriate injunctive relief and any other relief that this Court deems proper, just and equitable.

b.    Compensatory damages in the form of lost wages and back pay, accrued and prospective employee benefits, including but not limited to prospective retirement benefits, hospitalization and other insurance coverage, holiday and vacation pay, social security insurance, training opportunities and all fringe benefits, applicable seniority, raises and/or other conditions or employment: and mental and emotional distress related to said actions as deemed appropriate and just under the circumstances.

c.    Such other relief as may be applicable according to statutory and common law, including interest, costs and expert and attorney fees.

241.    Wherefore, the above considered, Plaintiff requests Judgment against all Defendants, jointly and severally, for actual and exemplary damages, attorneys' fees, and all equitable remedies allowable under law.

## COUNT TWO: FIRST AMENDMENT VIOLATION UNDER SECTION 42 U.S.C. 1983 as TO PLAINTIFF'S RIGHT TO PETITION

242.    Plaintiff hereby incorporates paragraphs 1-241 as if fully reincorporated herein.

243.    Plaintiff Milton A. Agay is and was a public employee, and reported to the Township Board of Trustees and to Defendant Hildebrand, and was told Letzmann had the authority to

deliberately find some sort of evidence to fire him at the time of all events as outlined above.

244.     Plaintiff complained formally to the Township Supervisor, Defendant Hildebrand, and the Township attorney, Robert Landgraf and Suzanne Renton, the Police Committee, and the entire Board, addressing matters of public concern, as to the illegal and discriminatory and retaliatory actions and performance of all individually named Defendants and their unlawful actions and policies.

245.     Plaintiff made public expressions of his concerns and opinions about the matter these matters of public concern, including discriminatory and illegal, unlawful actions of Defendants, both individually as public officials and as agencies of the government.

246.     In direct retribution and retaliation for Plaintiff's opposition to Defendants' illegal policies and actions, Defendants have then deliberately worked to wrongfully and successfully force Plaintiff out of his position as Police Chief, by false accusations of inappropriate, unethical and even criminal improprieties in his beloved career of law enforcement.

247.     These unlawful actions were undertaken by all individual Defendants acting under the color of state law in their official capacities, and by Letzmann as an admitted agent and representative of agency of local government, or the "state" for purposes of Constitutional protection.

248.     The actions of Defendants have culminated in the constructive discharge of Plaintiff from his job as Police Chief on or about February 14, 2014.

249.     The actions of Defendants have caused materially adverse employment action against Plaintiff and his constructive discharge.

250.     Defendants' actions, and those of Peter Letzmann as a state actor, as to Plaintiff as outlined in all paragraphs (above) have caused the constructive discharge of Plaintiff.

251.     Plaintiff's statements, complaints and actions about Defendants in their actions as public officials in opposing their discriminatory illegal actions, violations of various state, local and federal ordinances and illegal management was the only or substantially motivating factor for Defendants' actions toward Plaintiff and denying them material employment opportunities and constructive discharge, as outlined above.

252.     The materially adverse, retaliatory employment actions taken by Defendants were injurious actions that would likely chill a person of ordinary firmness from continuing to engage in that activity.

253.     As such, Defendants actions violated Plaintiff's well-established right to petition the government for redress, guaranteed under the First Amendment to the United State Constitution and his right to be free from retaliation in exercise thereof.

## DAMAGES

254.     Defendants' actions and omissions, negligence and intentional conduct as outlined above, paragraphs 1 through 253 has resulted in damages to Plaintiff Milton A. Agay as follows:

 a) loss of his job, destruction of his law enforcement career,

 b) extreme mental and emotional suffering, past, present and future,

 c) embarrassment, humiliation, past, present and future,

 d) consequential damages, past, present and future, including loss of seniority, pension accrual and benefits,

35

e) attorneys' fees and all allowable litigation costs,

f) and all damages provided for under federal and state law, as well as

g) constructive discharge .

## REQUESTED RELIEF

255.    WHEREFORE, the Plaintiff seeks all appropriate damages arising out of law, and claims in equity and fact for each or all of the above Counts where applicable and hereby requests this Court to award the plaintiff all applicable damages, including but not limited to compensatory, exemplary, and/or punitive and all other relief available to him including but not limited to:

a.      all appropriate injunctive relief and any other relief that this Court deems proper, just and equitable.

b.      Compensatory damages in the form of lost wages and back pay, accrued and prospective employee benefits, including but not limited to prospective retirement benefits, hospitalization and other insurance coverage, holiday and vacation pay, social security insurance, training opportunities and all fringe benefits, applicable seniority, raises and/or other conditions or employment: and mental and emotional distress related to said actions as deemed appropriate and just under the circumstances.

c.      Such other relief as may be applicable according to statutory and common law, including interest, costs and expert and attorney fees.

256.    Wherefore, the above considered, Plaintiff requests Judgment against all Defendants, jointly and severally, for actual and exemplary damages, attorneys' fees, and all equitable remedies allowable under law.

## COUNT THREE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

257.     Plaintiff reincorporates paragraphs 1-256 as if set forth in full herein.

258.     Defendants engaged in extreme and outrageous conduct in their unwarranted, actions towards Plaintiffs as outlined above, and in their constructive discharge from employment.

259.     Defendants' actions were intentional and/or reckless, and showed complete disregard for Plaintiff's emotional and mental well-beings.

260.     Plaintiff has suffered mental, physical and emotional distress as a result of Defendants' actions.

Wherefore, the above considered, Plaintiff requests Judgment against all Defendants, jointly and severally, for actual and exemplary damages allowable under law.

## COUNT FOUR: VIOLATIONS OF ELLIOTT/LARSEN/SEX DISCRIMINATION & RETALIATION FOR SAME

261.      Plaintiff hereby re-incorporates and re-states all of the aforementioned paragraphs 1-260 as if stated in full herein.

262.     Plaintiff has been subjected to retaliation for having engaged in the protected activity of trying to enforce his employees' and volunteers and citizens' rights to be free of gender/sex bias and discrimination under the Elliott/Larsen Civil Rights Act.

263.      Plaintiff put the Defendants on notice of his reasonable good faith belief that all the Defendants, except Letzmann, was discriminating against volunteers, employees and others in employment and training, hiring and recruitment policies and decisions on the basis of sex.

264.     White male police officer candidates and active volunteers have been permitted to attend the Police Academy and promise to reimburse the Defendant Township for the cost, in exchange for fulltime employment, or even permanent part-time employment, and have

routinely been approved, while Janetski, a very well-qualified candidate has been denied because not only is she female, she is an attractive female who was seen as a "temptation" to the male officers who would have to work with her.

265.    The Township, under Defendant Hildebrand had a pattern and practice of discouraging or denying female police volunteer or officers candidates the same opportunity as male officers, and Plaintiff opposed same, which resulted in extreme retaliation.

## RELIEF REQUESTED

266.    WHEREFORE, the above considered, the above Plaintiffs request entry of a Judgment against all Defendant(s) except Letzmann, and an award of all damages and equitable relief recoverable under the Elliott/Larsen Civil Rights Act, which flow from the illegal and intentional acts of Defendants, as well as common law torts, including any equitable remedies back pay, front pay, lost wages, consequential damages, attorneys' fees, costs and interest, and such other temporary and permanent equitable/injunctive and/or legal relief as the Court deems meet, including exemplary damages.

## COUNT FIVE : VIOLATION OF THE WHISTLEBLOWER'S PROTECTION ACT, MCLA 15.362 ET SEQ.

267.    Plaintiff re-incorporates the paragraphs Numbered 1-266 as if set forth in full herein.

268.    Defendant(s) Oronoko Township and Michael Hildebrand are both employers, as defined by MCLA 15.362, et seq, and have violated MCLA 15.362, et seq, by taking negative/ adverse job actions against Plaintiff, including the following:

    a) falsely accusing Plaintiff of failing to meet his position's work standards and engaging in some form of misconduct in office,

b) referring Plaintiff for investigation by Defendant Peter Letzmann to blacken his name and end his career in law enforcement, threatening criminal actions,

c) directly retaliating against Plaintiff for alerting the Township officials to Defendant Hildebrand's illegal behaviors and retaliation and harassment of Plaintiff for his protected activity in trying to enforce compliance by telling government officials, and, threatening to go beyond the Township, about deliberate violations of the Elliott/Larsen Civil Rights Act, the U.S. Constitution, Title VII of the Civil Rights Act of 1964, the "Hazwopper law" and/or "MIOSHA Hazardous Emergency Plans," both federal and state laws, and attendant regulations, MCLA 408.1024, Michigan Public Act, 154, 4080.1014(i) and 42 USC Sec. 6901, Resource Conservation and Recovery Act (RCRA), and Superfund Amendments and Reauthorization Act of 1986 (SARA) Title III, the Michigan Open Meetings Act (OMA) as well as the Bullard-Plawecki Employee Right to Know Act, and various state and local ordinances governing the public building codes, and operation of the Township Police Department.

269.    These actions were taken solely and/or primarily in direct retaliation for Plaintiff's report to the Township of alleged illegal activity on the part his supervisor and employers, Defendant Supervisor Michael Hildebrand, an agent and employee of Township, and as such the Township are strictly liable for the illegal actions of its supervisory employee, in their discrimination of Plaintiff.

## **DAMAGES**

270.    The actions and inactions of Defendants complained of in the foregoing paragraphs have been to deprive the Plaintiff of wages, past and prospective, income and other

employment benefits, including but not limited to prospective retirement benefits, and other fringe benefits of said employment, and have additionally subjected the Plaintiff to mental and financial distress and anxiety, loss of job, loss of self-esteem, humiliation and embarrassment, attorneys' fees, expert witness fees, costs of litigation and/or other damages and injunctive relief as provided in MCLA 15.362, et seq., MCLA 15.364, et seq.

## REQUESTED RELIEF

271.     WHEREFORE, the Plaintiff seeks all appropriate damages arising out of law, specifically MCLA 15.364 et seq., and claims in equity and fact for each or all of the above Counts where applicable and hereby requests this Court to award the plaintiff all applicable damages, including but not limited to compensatory, exemplary, and/or punitive and all other relief available to him including but not limited to:

a.      all appropriate injunctive relief and any other relief that this Court deems proper, just and equitable.

b.      Compensatory damages in the form of lost wages and back pay, accrued and prospective employee benefits, including but not limited to prospective retirement benefits, hospitalization and other insurance coverage, holiday and vacation pay, social security insurance, training opportunities and all fringe benefits, applicable seniority, raises and/or other conditions or employment: and mental and emotional distress related to said actions as deemed appropriate and just under the circumstances.

c.      Such other relief as may be applicable according to statutory and common law, including interest, costs and expert and attorney fees.

## COUNT SIX, VIOLATION OF PUBLIC POLICY

272.     Plaintiff hereby re-incorporates and re-states all of the aforementioned paragraphs 1-271 as if stated in full herein.

273.     To the extent not otherwise proscribed by specific legislative enactments, state or federal, the Defendants forced Plaintiff to violate laws, well settled legislative enactments or be subject to adverse employment action, harassment, and retaliation making it impossible for him to continue in his employment.

## DAMAGES

274.     Defendants' actions and omissions, negligence and intentional conduct as outlined above, paragraphs 1 through 273 has resulted in damages to Plaintiff Milton A. Agay as follows:

    a) loss of his job, destruction of his law enforcement career,

    b) extreme mental and emotional suffering, past, present and future,

    c) embarrassment, humiliation, past, present and future,

    d) consequential damages, past, present and future, including loss of seniority, pension accrual and benefits,

    e) attorneys' fees and all allowable litigation costs,

    f) and all damages provided for under federal and state law, as well as

    g) constructive discharge .

## REQUESTED RELIEF

275.     WHEREFORE, the Plaintiff seeks all appropriate damages arising out of law, and claims in equity and fact for each or all of the above Counts where applicable and hereby requests this Court to award the plaintiff all applicable damages, including but not limited to

compensatory, exemplary, and/or punitive and all other relief available to him including but not limited to:

    a.    all appropriate injunctive relief and any other relief that this Court deems proper, just and equitable.

    b.    Compensatory damages in the form of lost wages and back pay, accrued and prospective employee benefits, including but not limited to prospective retirement benefits, hospitalization and other insurance coverage, holiday and vacation pay, social security insurance, training opportunities and all fringe benefits, applicable seniority, raises and/or other conditions or employment: and mental and emotional distress related to said actions as deemed appropriate and just under the circumstances.

    c.    Such other relief as may be applicable according to statutory and common law, including interest, costs and expert and attorney fees.

## COUNT SEVEN, RETALIATION FOR FILING A WORKER'S COMPENSATION CLAIM

276.    Plaintiff hereby re-incorporates and re-states all of the aforementioned paragraphs 1-275 as if stated in full herein.

277.    Plaintiff filed a worker's compensation claim for his various physical manifestations of his work related stress and PTSD, and was denied by his employer.

278.    Defendants took all or part of the various adverse actions outlined above in direct violation of MCLA 418.301(13), the Michigan Worker's Disability Compensation Act of 1969, as amended, as Plaintiff sough to enforce his rights to work related medical treatment under the law.

## DAMAGES

279.    Defendants' actions and omissions, negligence and intentional conduct as outlined above, paragraphs 1 through 274 has resulted in damages to Plaintiff Milton A. Agay as follows:

    a) loss of his job, destruction of his law enforcement career,

    b) extreme mental and emotional suffering, past, present and future,

    c) embarrassment, humiliation, past, present and future,

    d) consequential damages, past, present and future, including loss of seniority, pension accrual and benefits,

    e) attorneys' fees and all allowable litigation costs,

    f) and all damages provided for under federal and state law, as well as

    g) constructive discharge .

## REQUESTED RELIEF

280.    WHEREFORE, the Plaintiff seeks all appropriate damages arising out of law, and claims in equity and fact for each or all of the above Counts where applicable and hereby requests this Court to award the plaintiff all applicable damages, including but not limited to compensatory, exemplary, and/or punitive and all other relief available to him including but not limited to:

    a.       all appropriate injunctive relief and any other relief that this Court deems proper, just and equitable.

    b.       Compensatory damages in the form of lost wages and back pay, accrued and prospective employee benefits, including but not limited to prospective retirement benefits, hospitalization and other insurance coverage, holiday and vacation pay, social security

insurance, training opportunities and all fringe benefits, applicable seniority, raises and/or other conditions or employment: and mental and emotional distress related to said actions as deemed appropriate and just under the circumstances.

      c.    Such other relief as may be applicable according to statutory and common law, including interest, costs and expert and attorney fees.

**COUNT EIGHT: VIOLATION UNDER SECTION 42 U.S.C. 1983 as TO PLAINTIFF'S RIGHT TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT TO A LEGITIMATE PROPERTY & LIBERTY INTEREST**

281.    Plaintiff hereby incorporates paragraphs 1-281 as if fully reincorporated herein.

282.    Plaintiff Milton A. Agay is and was a public employee, and reported to the Township Board of Trustees and to Defendant Hildebrand, and was told Letzmann had the authority to deliberately find some sort of evidence to fire him and deprive him of his property interest in his continued employment at the time of all events as outlined above.

283.    Plaintiff complained formally to the Township Supervisor, Defendant Hildebrand, and the Township attorney, Robert Landgraf and Suzanne Renton, the Police Committee, and the entire Board, addressing matters of public concern, as to the illegal and discriminatory and retaliatory actions and performance of all individually named Defendants and their unlawful actions and policies.

284.    Plaintiff made public expressions of his concerns and opinions about the matter these matters of public concern, including discriminatory and illegal, unlawful actions of Defendants, both individually as public officials and as agencies of the government.

285.    In direct retribution and retaliation for Plaintiff's opposition to Defendants' illegal policies and actions, Defendants have then deliberately worked to wrongfully and

successfully force Plaintiff out of his contracted position as Police Chief, by false accusations of inappropriate, unethical and even criminal improprieties in his beloved career of law enforcement without appropriate due process of any kind as required by law, in a clumsy effort to establish "just cause" per the contract in direct retaliation for his exercise of his Constitutional rights.

286.     These unlawful actions were undertaken by all individual Defendants acting under the color of state law in their official capacities, and by Letzmann as an admitted agent and representative of agency of local government, or the "state" for purposes of Constitutional protection, and in so doing, deprived Plaintiff of his liberty and property interest in his contracted position as Police Chief, protected by the Due Process Clause of the Fourteenth Amendment.

287. The actions of Defendant(s) culminated in the constructive discharge of Plaintiff   from his job as Police Chief on or about February 14, 2014, a deprivation of his liberty and property interest in his employment, without affording him adequate procedural rights prior to depriving him of this protected property and liberty interest, as the predetermined conclusions as admitted to by Defendant Letzmann, acting on behalf of the Board and threats of criminal prosecution unless he submitted an immediate resignation without any specific notice or list of charges against him, lack of provision of the employer's evidence, and lack of opportunity to be meaningfully heard on same, and his name cleared publicly is violative of the First and Fourteenth Amendments.

288.     The actions of Defendants caused Plaintiff's loss of his liberty and property interest in his contract for employment, as Police Chief, and his law enforcement career, as the

45

allegations made, and the "internal" hearing attempted including very stigmatizing and humiliating assertions that prevent any future employment in law enforcement for the Plaintiff.

289.    Defendants' actions, and those of Peter Letzmann as a state actor, as to Plaintiff as outlined in all paragraphs (above) have caused the loss Plaintiff's protected liberty and property interest.

290.    Plaintiff's statements, complaints and actions about Defendants in their actions as public officials in opposing their discriminatory illegal actions, violations of various state, local and federal ordinances and illegal management was the only or substantially motivating factor for Defendants' actions toward Plaintiff and denying them material employment opportunities and constructive discharge, as outlined above.

291.    As such, Defendants actions violated Plaintiff's well-established right to Due Process under the Fourteenth Amendment, guaranteed under the United State Constitution.

292.    Wherefore, the above considered, Plaintiffs request Judgment against all Defendants, jointly and severally, for actual and exemplary damages, attorneys' fees and all damages and equitable relief allowable under law.

## COUNT NINE: LOSS OF CONSORTIUM FOR PLAINTIFF MICHELLE AGAY

293.    Plaintiff Michelle Agay hereby incorporates paragraphs 1-292 as if fully reincorporated herein.

294.    Plaintiff Michelle Agay has been and is lawfully married to Plaintiff Milton A. Agay, and has been at all times outlined in the above complaint.

295.    Plaintiff's marriage and rights of consortium and services of the marital relationship

have been damaged and harmed by the wrongful acts outlined above.

## REQUESTED RELIEF

296.    WHEREFORE, Plaintiff Michelle Agay seeks all appropriate damages arising out of law, and claims in equity and fact for each or all of the above Counts where applicable and hereby requests this Court to award the plaintiff all applicable damages, including but not limited to compensatory, exemplary, and/or punitive damages and all other relief available to her under the law.

Respectfully Submitted,

May 1, 2014                              EARDLEY LAW OFFICES, P.C.
                                         Counsel for Plaintiffs

                                         /s/ *Eugenie B. Eardley*
                                         Eugenie B. Eardley (P48615)
                                         P.O. Box 830
                                         Cannonsburg, MI 49317
                                         (616) 874-2647
                                         genieb@eardleylaw.com

UNITED STATES OF AMERICA

IN THE DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

MILTON ABRAHAM AGAY
& MICHELLE AGAY

       Plaintiffs,

                                           Case No. 14-

-v-

                                           Hon.

                                           Mag.

MICHAEL HILDEBRAND in his individual capacity and
his official capacity Township Supervisor of Oronoko Charter Township,
a Michigan municipal corporation & the Oronoko Charter Township,
Peter Letzmann, individually, and d/b/a as Letzmann Associates
               Defendants.
                           _____

Eugenie B. Eardley (P48615)
Nicholas F.X. Gumina (P74203)
EARDLEY LAW OFFICES, P.C.
Attorneys for Plaintiffs
P.O. Box 830
Cannonsburg, MI 49317-0830
(616) 874-2647
genieb@eardleylaw.com

### Demand for Jury Trial

      The Plaintiffs, by and through their attorneys, Eardley Law Offices, & hereby demands a

trial by jury on all issues in the instant action.

Respectfully submitted,

May 1, 2014                          EARDLEY LAW OFFICES, P.C.
                                    Counsel for Plaintiffs

                                    /s/ *Eugenie B. Eardley*
                                    Eugenie B. Eardley (P48615)
                                    P.O. Box 830
                                    Cannonsburg, Michigan 49317
                                    (616) 874-2647
                                    genieb@eardleylaw.com